**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | **CRIMINAL NUMBER 22-118-1** |
| | : | |
| | : | |
| MAHMOUD ALI AHMED RASHWAN | : | |

<u>**DEFENDANT'S OMNIBUS PRETRIAL MOTION**</u>

Mahmoud Ali Ahmed Rashwan, by and through his attorney, Jonathan McDonald, Federal Community Defender Office for the Eastern District of Pennsylvania, respectfully submits this Omnibus Pre-trial Motion to clarify the issues outstanding in his previously filed Motion to Dismiss Counts One and Two of the Superseding Indictment (Doc. No. 42), Motion to Suppress Evidence Obtained from Unlawful Arrest (Doc. No. 54) and amended Motion to Suppress (Doc. No. 55), Motion to Dismiss on Grounds of Selective Prosecution, Selective Enforcement, and Abuse of Process (Doc. No. 56), and Motion to Compel Discovery (Doc. No. 93).

**I.      MOTION TO SUPPRESS**

Mr. Rashwan rests in part on the previously filed briefs supporting his Motion to Suppress on Fourth Amendment grounds and seeks an evidentiary hearing to question the arresting task force officer, game warden, and case agents regarding the activities that occurred at the State Game Lands Firing Range.  During a previous conference with the Court, the Court pointed out that previous filings sought suppression of the federal firearms forms allegedly filled out by Mr. Rashwan when he sought to purchase firearms from a federal licensee.  Mr. Rashwan withdraws this request, as the ATF Form 4473 was not fruit of any illegal seizure.  The items

collected as a result of Mr. Rashwan's illegal detention and arrest are set forth in the FBI's
Collected Item Log, all of which should be suppressed:

- Stag Arms, Model Stag-15, 5.56 caliber firearm, Serial #21295;

- Weapon bag with weapon tool kit, eye protection, and hard ear protection;

- Pack of Range Targets;

- (9) 30 round capacity PMAG 5.56 caliber magazine;

- (2) 20 round capacity PMAG 5.56 caliber magazines;

- (97) Remington .223 rounds;

- Mr. Rashwan's Brown wallet with various credit cards, his PA driver's license, and his Employment Authorization Card;

- $107 in various denominations; and

- Mr. Rashwan's Black iPhone XR with MEI 3564511007584347.

Additionally, the incriminating statements Mr. Rashwan made about purchasing and
possessing the firearm, traveling to the Heritage Guild and Pennsylvania State Game Lands #205
Rifle Range in New Tripoli, PA to shoot the firearm, the completion of his ATF Form 4472 and
his immigration status both during the encounter and after he was transported to the FBI's field
office must be suppressed for the reasons set forth below.  Specifically including, but not limited
to, any of the following statements made Mr. Rashwan at the State Game Lands, during
transport, and after he was transported to the FBI's field office must be suppressed:

- all statements related to seeking or obtaining firearms including discussion of gun shows and anything related to any online gun forums;

- all statements related to firearms and firearm related accessories (including firearm possession, use, ownership, construction, storage bags, magazines, scopes, safety equipment, ammunition and other accessories, etc.);

- all statements related to shooting or possessing firearms at the Heritage Guild, State Game Lands, or at any other location); and

- all statements related to citizenship or anything related immigration proceedings (including current immigration status, any immigration proceedings, country of birth, nationality, asylum, prior military experience, history of arrests or detention, past or present addresses, details of personal relationships, marital status, and residency within the United States generally).

Counsel seeks to suppress all the above for the reasons previously stated as well as those set forth below.

### A.     The ping warrant is not supported by probable cause

Prior to the agents' in-person encounter with Mr. Rashwan leading to his arrest, the government obtained a "ping" warrant from a United States Magistrate Judge authorizing it to collect prospective E-911 Phase II data, commonly known as GPS data or latitude-longitude data, and prospective cell-site data from AT&T, Mr. Rashwan's cellular service provider, which would indicate which cellular towers Mr. Rashwan's cell phone sent radio signals to.[1] *See* Search Warrant, appended hereto as "Exhibit A." The warrant also authorized collection of other data from Mr. Rashwan's phone, such as all phone numbers he made calls to or received calls from. The warrant was accompanied by a probable cause affidavit, which was amended and

---

[1] The warrant also authorizes data typically subject to the statutory requirements of a pen register, but the collection of data at issue here – prospective GPS coordinates – exceeds the scope of that statute, which is presumably why the government obtained a warrant. For ease of reference this memorandum will refer to it as a "ping" warrant.

approved by a Magistrate Judge.  The information collected by this warrant was what notified the agents Mr. Rashwan was at the State Game Lands Firing Range and allowed them to instruct Warden Furmato shortly after his arrival to not let any of the Rashwan brothers leave the range. Because this warrant was not supported by sufficient evidence to make out probable cause under the circumstances, all the evidence which flowed from it – the Stag Arms firearm, ammunition, and Mr. Rashwan's statements, in particular – must be suppressed as fruit of the poisonous tree. *See*, e.*g., Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

A search warrant is only valid if the "magistrate who issued the warrant had a 'substantial basis' for determining that probable cause existed."  *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002) (citing *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993)).  The "substantial basis" inquiry requires this Court to evaluate only the facts before the issuing Magistrate Judge, *i.e.*, within the four corners of the affidavit, and not other evidence in the record.  *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (quoting *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993)).

Probable cause has been defined as "a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Here, the particular place is Mr. Rashwan's cell phone location data.  Probable cause is determined under the totality of the circumstances.  It is a "fluid concept" that depends on "the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules."  *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011) (quoting *United States v. Shields*, 458 F.3d 269, 277 (3d Cir. 2006)) (additional citations omitted).   While a magistrate's decision is entitled to great deference, "[t]his, however, 'does not mean that

reviewing courts should simply rubber stamp a magistrate's conclusions.'" *Zimmerman*, 277 F.3d at 432 (citations omitted).

The amended search warrant affidavit in this case does not set forth sufficient probable cause to believe prospective GPS coordinates tracking Mr. Rashwan's movements was likely to lead to evidence of the suspected crimes or establish another exigent need to track Mr. Rashwan's movements into both private and public spaces.  As the Supreme Court stated in *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1967):

> The requirements of the Fourth Amendment can secure the same protection of privacy whether the search is for "mere evidence" or for fruits, instrumentalities or contraband.  There must, of course, be a nexus – automatically provided in the case of fruits, instrumentalities or contraband – between the items to be seized and criminal behavior.  Thus, in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction.  In so doing, consideration of police purposes will be required.

*Id.* at 306-07 (citations omitted).

The "police purpose" to be served by the prospective collection of Mr. Rashwan's physical location over the course of an entire month was the agents' desire to catch him in possession of a firearm and attempting additional firearms purchases.  Paragraph 20 of the amended probable cause affidavit states "[t]he investigation has revealed that Rashwan's behavior has escalated from going to Heritage Guild where he rented firearms to shoot, to actually attempting to purchase a firearm as demonstrated by his completion of the Form 4473."  Ex. A ¶ 20.  It suspects evidence of the suspected criminal violations "will be obtained through the issuance of this search warrant, to include the identification of locations where Rashwan illegally possesses and discharges firearms at shooting ranges, and further attempts by Rashwan to illegally purchase firearms and submit false information on Forms 4473 to illegally acquire the firearms."  *Id.*  This was simply too

speculative to establish a likelihood evidence of the suspected criminal violations would be found through tracking Mr. Rashwan's movements.

Notably, the collection of location information, whether it be through the placing of a GPS tracking device on a vehicle as in *United States v. Jones*, 565 U.S. 400 (2012) (requiring a probable cause warrant to place a GPS tracker on a suspect's vehicle), the collection of historical cell site information, *see Carpenter v. United States*, 138 S. Ct. 2206 (2018) (requiring a probable cause warrant to obtain historical cell site location information), or the prospective and/or real-time collection of GPS coordinates as in the present case, provides law enforcement with intimate details of a person's life.  As the Court stated in *Carpenter*, "[a]s with GPS information, the time-stamped data provides and intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'"  *Carpenter*, 138 S. Ct. at 2217 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)).  "And like GPS monitoring, cell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools.  With just the click of a button, the Government can access each carrier's deep repository of historical information at practically no expense."  *Id.* at 2217-18.

In the case of prospective GPS location information, the warrant will thus authorize the government to learn intimate details about the suspect's private life even though much of it will have nothing to do with the crime he is suspected of committing. The tracking is also likely to reveal the suspect's presence in constitutionally protected places, such as the home.  For this reason, Mr. Rashwan submits that a warrant authorizing the collection of such data for future or real-time location data should be

required to establish a nexus between the cell phone and the suspected crimes, that the location data will likely lead to the discovery of evidence of the suspect's alleged crimes, or, at a minimum, establish there is probable cause to believe such a sweeping array of information is necessary to apprehend a suspect at large.  *See Gates*, 462 U.S. at 238; *Hayden*, 387 U.S. at 307 (discussing the "nexus" requirement that evidence of alleged crimes will likely be found in a particular place); *cf. United States v. Gonzalez-Renteria*, No. 1:17-cr-0292, 2021 U.S. Dist. LEXIS 262994, at *12-13 (N.D. Ga. Dec. 9, 2021), *approved and adopted by United States v. Gonzalez-Renteria*, 2022 U.S. Dist. LEXIS 214150 (N.D. Ga. Nov. 29, 2022) (the warrant affidavit detailed how a drug organization was using the holder of the pinged cell phone to collect drug proceeds, linking the targeted phone to drug sales and money laundering).

The *Gonzalez-Renteria* court, citing *Hayden*, held there was a nexus between the items to be seized and the criminal behavior because the affidavit demonstrated how drug co-conspirators used PIN-to-PIN conversations to communicate amongst themselves and with the holder of the targeted phone, as well as a link between scheduled narcotics-proceeds pickups and the user of the targeted phone.  Thus, the affidavit "demonstrated that geo-location data from the target phone would likely provide evidence of criminal activity."  *Id.* at *15-17; *see also United States v. Razhden*, No. 17-cr-0350, 2017 U.S. Dist. LEXIS 209340, at *27-28 (S.D.N.Y. Dec. 20, 2017) ("the detailed GPS Affidavit specifies which phones were to be tracked and how each of the purported owners of those phones was involved in the criminal conspiracy, *including in ways that involved their cellphones*.") (emphasis added); *United States v. Christian*, No. 1:16-cr-207, 2017 U.S. Dist. LEXIS 80251, at * (E.D. Va. May 24, 2017) (holding proof the cell phone was used

to conduct criminal activity is not required; accordingly, the nexus requirement was met because the probable cause affidavit established that Christian "was actively involved in procuring and distributing . . . cocaine, and it established that law enforcement officers needed information about defendant's location to identify the locations where the drug trafficking activity was taking place," so the tracking was likely to assist in apprehending him or discovering evidence to prove the drug charges against him); *contrast United States v. Powell*, 943 F. Supp. 2d 759, 778-79 (E.D. Mich. 2013) (holding when the government seeks a warrant for long term, real time tracking via a defendant's cell phone, it must show (1) the location of the person it intends to track is relevant to the investigation of ongoing crime or evidence sought, (2) the suspect is the likely user of the phone and uses the phone in connection with criminal activity).

The *Christian* court relied on a non-precedential Fourth Circuit opinion, *United States v. Gibbs*, 547 Fed. App'x 174, 179 (4th Cir. 2013), which held that GPS monitoring of a cell phone was supported by probable cause because it showed the "existence of criminal activity, a link between the person whose phone was to be tracked and that criminal activity, and whether location information would likely reveal evidence of the crime." *Christian*, 2017 U.S. Dist. LEXIS 80251, at *27 (citing *Gibbs*, 547 Fed. App'x at 179). That is precisely the showing Mr. Rashwan submits the government failed to sufficiently make in the amended probable cause affidavit authorizing government tracking of his cell phone.

The agents indicated on the warrant application they hoped to seize "evidence of a crime" pursuant to Federal Rule of Criminal Procedure 41(c). However, Paragraph 20 of the amended affidavit is pure speculation. It fails to adequately establish probable

cause that the cell phone's real-time tracking of Mr. Rashwan's location would likely reveal evidence of the alleged crimes or establish another law enforcement need or exigency to justify tracking his whereabouts. *Cf.* 18 U.S.C. § 2518(1)(c) (requiring a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous" to obtain a Title III wiretap).

Although the government attempted to cure the affidavit's defect by adding Paragraph 20 to the amended probable cause affidavit, it failed to do more than speculate that Mr. Rashwan would attempt to purchase or fire another gun. The allegation that single attempt to purchase a firearm was made once does not create a sufficient likelihood to justify a ping warrant. The evidence was simply too thin and tenuous to support a finding that it was likely the real-time tracking would reveal further evidence of illegal gun possession or future attempted purchases. This renders the amended probable cause affidavit fatally deficient in establishing probable cause such that the government cannot avail itself of the good faith exception to the exclusionary rule. *Hodge*, 246 F.3d at 308 (explaining the good faith exception is inapplicable where a warrant's supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable") (citations omitted); *see also United States v. Leon*, 468 U.S. 897, 922-23 (1984) (citations omitted). There is simply no reason the agents could not have used less intrusive traditional law enforcement database searches and surveillance, such as obtaining video footage of Mr. Rashwan during his previous visit to the Heritage Guild firing range, to obtain more evidence of the suspected crimes.

The warrant affidavit thus failed to establish probable cause for the search of Mr. Rashwan's location information. Based on this fatal deficiency, no reasonable agent would rely on the Magistrate Judge's authorization of the warrant. Accordingly, all the evidentiary fruits of the defective ping warrant – namely, the Stag Arms firearm, ammunition, and Mr. Rashwan's on-scene and stationhouse statements – must be suppressed. *Wong Sun*, 371 U.S. at 488. But for the unlawfully authorized ping, Warden Furmato likely would have checked Mr. Rashwan's range permit, instructed the Rashwan brothers to move their vehicle to a proper parking spot, and went about his day. Instead, the ping warrant enabled law enforcement to effectively seize and detain Mr. Rashwan until they could employ a ruse to obtain an unlawful confession from him. This Court should hold that the Fourth Amendment does not countenance the seizure of such a vast array of information absent a proper nexus.

### B.    Mr. Rashwan's statements are fruits of the Fourth Amendment violation.

The exclusionary rule prohibits the introduction of the "fruits" of police illegality, meaning all evidence "acquired as an indirect result of [an] unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (internal quotation marks omitted). In assessing attenuation, courts consider such factors as the temporal proximity between the illegal search and the statement, the presence of intervening circumstances, and, particularly, the "purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

Here, any statements by Mr. Rashwan that he owned and shot the Stag Arms firearm, as well as information he provided about purchasing it and the completion of his immigration

paperwork, are just a single degree removed from the illegal detention and arrest, in that these statements were made during and directly after the detention became an unlawful de facto (and eventually formal) arrest without probable cause, prompted by reliance on the defective ping warrant. Mr. Rashwan's post-formal arrest statements at the FBI Field Office were also obtained in close temporal proximity. The precise time it took to transport Mr. Rashwan from the State Game Lands Rifle Range to the Allentown FBI Office is not known. However, the FBI Form 302 memorializing Agent Garcia and Task Force Officer Kreider's interview with Mr. Rashwan infers he was interviewed soon after they arrived.

The government cannot identify any "meaningful intervening event" attenuating the straightforward relationship here between the unlawful action and any inculpatory statement. *Taylor v. Alabama*, 457 U.S. 687, 691 (1982). Even where a statement is given six hours after arrest by a suspect who has been taken to a station house, advised of his *Miranda* rights three times, and had opportunity to speak in person with those close to him, sufficient attenuation will not necessarily be found. *Id.* at 691-92 (ordering statement suppressed where suspect arrested without probable cause); *see also United States v. Marrese*, 336 F.2d 501, 504 (3d Cir. 1964) (suppressing statement made 22 hours after unlawful search of residence). As *Taylor* and other cases make clear, the government's representation that Mr. Rashwan had been Mirandized and signed an Advice of Rights Form (FD-395) would by no means suffice to sever the requisite causal connection between the unlawful intrusion and the post-arrest statement. *See Taylor*, 457 U.S. at 690; *Brown*, 422 U.S. at 603.

The flagrancy of the misconduct also weighs heavily in favor of suppression. The Third Circuit has explained this prong as follows: "[i]n *Brown*, the Supreme Court noted that "[t]he impropriety of the arrest was obvious . . . The arrest, both in design and in execution, was

11

investigatory.  The detectives embarked upon this expedition for evidence in the hope that something might turn up."  *United States v. Luna*, 76 Fed. App'x 411, 414 (3d Cir. 2003) (not precedential) (quoting *Brown*, 422 U.S. at 605).  Here, encounter with Mr. Rashwan leading to his arrest and search of his person incident to arrest had no constitutional justification and were undertaken in the hopes useful evidence would turn up – such as the extraction of statements necessary to make out both the *actus reus* and *mens rea* elements of the suspected federal crimes. This Fourth Amendment violation was just as flagrant, if not more so, as those committed in other cases where courts suppressed statements as the fruits of unlawful searches and seizures. *See, e.g., United States v. Rivera-Padilla*, 365 Fed. Appx. 343, 344-45 (3d Cir. 2010) (not precedential) (unlawful search conducted after agents arrived on scene to execute an arrest warrant); *United States v. Baldwin*, 114 Fed. App'x 675, 676-77, 685 (6th Cir. 2004) (not precedential) (noting that the "investigatory" stop was "precisely the type of conduct that *Brown* and its progeny seeks to deter").

In sum, the factors bearing on "fruits" analysis do not suggest any attenuation of a kind that could "purge the primary taint of the unlawful intrusion."  *Brown*, 422 U.S. at 603. Accordingly, any statements must be deemed the products of the unlawful ping warrant and detention of Mr. Rashwan, which morphed into a de facto arrest absent probable cause. Accordingly, Mr. Rashwan's statements made both before and after his formal arrest must be suppressed for all purposes at trial to comport with his Fourth Amendment rights.

C.     **The statements were taken in violation of *Miranda v. Arizona* and *Missouri v. Seibert*.**

Mr. Rashwan's statements must still be suppressed even if the Court determines his detention and arrest were supported by the requisite probable cause.  The initial on-scene statements provided to Warden Furmato and TFO Kreider were the result of custodial

interrogation without the prophylactic warnings required by *Miranda v. Arizona*, and his post-arrest Mirandized statements were unlawfully obtained pursuant to the prohibited "question first, warn later" law enforcement technique forbidden by *Missouri v. Seibert*.

The Fifth Amendment provides, in pertinent part, that "No person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V.  The purpose of the Fifth Amendment's privilege against self-incrimination is to protect a suspect from being subjected to the "cruel trilemma of self-accusation, perjury or contempt" when answering to an accusation of criminal wrongdoing.  *Pennsylvania v. Muniz*, 496 U.S. 582, 596-97 (1990).  "In *Miranda v. Arizona*, the [Supreme] Court recognized that custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'"  *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)).  Thus, the Supreme Court crafted procedural safeguards for the police to follow prior to taking a suspect's statement.  *Moran*, 475 U.S. at 420.

Specifically, a suspect should be warned that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (quoting *Miranda*, 384 U.S. at 479).  A statement taken in violation of these safeguards and absent a proper waiver must be suppressed.  *See, e.g., Miranda*, 384 U.S. at 478-79.

      1.  *Mr. Rashwan's on-scene statements were taken in violation of Miranda.*

        **a.**      **Mr. Rashwan was in custody for Miranda purposes.**

To trigger the need for police to give a suspect *Miranda* warnings, a suspect must be subjected to a custodial interrogation. *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). The "custody" determination requires the following two-part inquiry: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "Once the scene is set and the players' lines and actions reconstructed, the court must apply an objective test to resolve the ultimate inquiry: [was] there a formal arrest or restraint on freedom of movement of the degree normally associated with a formal arrest." *Id.* (citations omitted) (alteration in original and internal quotation marks omitted). Specifically, the court must consider "how a reasonable man in the suspect's position would have understood his situation." *United States v. Elias*, 832 F.2d 24, 26 (3d Cir. 1987) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).

The Third Circuit has noted that a "variety of factors" are relevant to a determination of whether a suspect was in custody, such as:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006) (citations omitted).

Here, Mr. Rashwan was in custody for *Miranda* purposes even if the initial encounter with Warden Furmato and TFO Kreider did not violate the Fourth Amendment. Warden Furmato was first to arrive on scene during his normal patrol duties because he noticed a vehicle parked in an inappropriate place. Warden Furmato is contacted by TFO Kreider before he can check on the individuals and is instructed to return to his vehicle and is told to hold the men. The

14

body camera footage begins at about 12:28 p.m. as the warden is returning to talk to the three men. Less than two minutes into the video, Warden Furmato took a picture of Mr. Rashwan's range permit and ran a check on it.  Around eight minutes into the video, Warden Furmato confiscated all three men's driver's licenses and returned to his truck to run them through his police databases.  Shortly after the fourteen-minute mark, around 12:43 p.m., TFO Kreider instructs Warden Furmato in no uncertain terms, "The individuals you are out with, nobody leaves."

TFO Kreider arrived on scene around 12:53 p.m. after Warden Furmato had already been asking the three brothers questions for over 25 minutes and law enforcement had custody of their licenses.  The law enforcement agents continued operating under the ruse that they needed to clear up the serial number on the firearm and the range permit in an effort to stall so the federal agents who hoped to arrest Mr. Rashwan could drive to the range on the wintry snow-covered roads.  Thus, even if the Warden and TFO did not tell the brothers they were not free to leave, any reasonable person in their position would have felt compelled to stay put.  Although the location of the initial statements was not at a police stationhouse where the coercive atmosphere is arguably strongest, the incriminating questions about the firearm the men were shooting rendered the setting more coercive than say, the defendant's home, because the location was tied to the alleged crime.  Furthermore, the three brothers were made to stand out in the blistering cold for nearly an hour before they were permitted to sit inside the officers' police pickup trucks.

The length of the interrogation heavily favors a finding of *Miranda* custody.  The encounter began with Warden Furmato some time prior to 12:28 p.m. and the TFO arrived on scene approximately 25 minutes later and immediately began asking incriminating questions about the firearm.  He continued mixing incriminating questions in with innocuous conversation,

returning to his vehicle multiple times and discussing the Stag Firearm repeatedly until the FBI agents ultimately asked him to confiscate and secure the firearm around 1:34 p.m. – over an hour after Mr. Rashwan was originally encountered.  The FBI agents arrived at roughly 1:59 p.m., about an hour and a half after Mr. Rashwan was first approached for a putative consensual encounter by Warden Furmato.  Mr. Rashwan was then arrested and eventually transported to the Allentown Regional Office.  This prolonged encounter in the freezing cold heavily supports a finding of custody.

Although the Warden and TFO did not use forceful language or draw weapons, they did in fact confiscate the Rashwan brothers' identifications and the firearm such that no reasonable person would have felt they could terminate the encounter and leave.  Therefore, while their movement was not forcefully restrained by handcuffs until the arrest was made, the agents effectively prohibited the men from leaving.  And finally, even though Mr. Rashwan was cooperative and answered the questions he was asked, he did so because they were asked under the ruse of clearing up discrepancies in his firearm serial number and range permit.  This is not a case where Mr. Rashwan was asked to come into the agents' offices for a conversation.  It happened during an encounter that went from consensual to a de facto arrest.  *Contrast United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010) (interrogation ultimately ruled non-custodial where the defendant voluntarily met up with an agent at the FBI offices after previously refusing to be questioned); *Oregon v. Mathiason*, 429 U.S. 492, 493, 495-96 (1977) (defendant was not in custody where a police officer left a note asking him to call to discuss something and a meeting was later set up at the parole office, where the officer made sure to tell the defendant he was not under arrest at the beginning of the encounter).

16

Although the test is an objective one, it is notable that the agents subjectively were instructed by the FBI not to let anyone leave from the onset.  Warden Furmato, the first responding officer, relates to Warden Barnes over the radio that he initially stopped at the firing range because he noticed a car that was parked in an inappropriate place.  Before Warden Furmato could check the individuals, he was contacted by TFO Kreider who inquired about the presence of any middle eastern males and instructed Warden Furmato to hold them there. The Warden and TFO then proceeded to ask incriminating questions for over an hour before Mr. Rashwan was formally arrested.  Given the confiscation of Mr. Rashwan's identification and the ruse to check the firearm and range permit numbers to clear up discrepancies – during which the TFO told Mr. Rashwan more than once he did not know whether there was a problem – in the freezing cold, snow and wind, this encounter was sufficient to cross the line into custody for *Miranda* purposes.

### b.      Mr. Rashwan was interrogated.

A suspect is interrogated by police when he is subjected to express questioning or its functional equivalent.  *United States v. Walton*, 10 F.3d 1024, 1028 n.2 (3d Cir. 1993) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1981)).  There is no doubt Mr. Rashwan was subjected to express questioning.  Indeed, both Warden Furmato and TFO Kreider asked Mr. Rashwan incriminating questions about who owned the firearm, who had been shooting it, where it was obtained, and where it had previously been shot at Heritage Guild.  When a police officer asks a suspect whether contraband belongs to him and other questions necessary to make out anticipated charges against him, it is the quintessential example of express questioning.

Therefore, Mr. Rashwan was subjected to a custodial interrogation, and he was entitled to the safeguards afforded under *Miranda* and its progeny.  Warden Furmato and TFO Kreider did

not provide Mr. Rashwan with the requisite *Miranda* warnings before the custodial interrogation, and he ultimately elicited an incriminating response regarding Mr. Rashwan's firearm purchase and possession. Because these initial, on scene statements were taken absent the safeguards afforded under *Miranda*, any of them which followed the point where the Court determines the encounter crossed the line into "custodial" must be suppressed. *See Miranda*, 384 U.S. at 478-79.

          2.    *The stationhouse statements must be suppressed under Seibert.*

Once FBI Agents Garcia and Dvorak arrived on scene, Mr. Rashwan was promptly handcuffed and arrested. It appears he was transported to the FBI Allentown Regional Office shortly thereafter, where he was provided with proper *Miranda* warnings and signed the form FD-395 waiving his rights in the presence of Agent Garcia and TFO Kreider, who had extracted most of his incriminating on-scene statements. He proceeded to answer several questions and provided incriminating statements about the Stag Firearm and how he obtained it. These statements must be suppressed because law enforcement employed a prohibited "question first, warn later" technique.

In *Oregon v. Elstad*, 470 U.S. 298 (1985), the United States Supreme Court held that:

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Id.* at 314. In *Elstad*, the police arrived at the defendant's home with an arrest warrant. *Id.* at 300. The defendant's mother led the police to his room, and one officer subsequently took him into the living room while the other officer took his mother into the kitchen. *Id.* at 300-01. The

18

officer asked the defendant whether he knew why the police where there, whether he knew a certain individual, and whether he knew there was a robbery at that person's house.  *Id.* at 301.  The officer told the defendant he "felt he was involved in that," and the defendant agreed he had been there.  *Id.*  Approximately one hour later, the police provided the defendant with *Miranda* warnings in a police office, and the defendant waived his rights and confessed.  *Id.*

The Supreme Court later addressed a different but related factual scenario in *Missouri v. Seibert*, 542 U.S. 600 (2004).  The police officer in *Seibert* admitted during his suppression hearing testimony that he deliberately withheld "*Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that [the defendant has] already provided once.'"  *Id.* at 605-06.  The Supreme Court held that "[b]ecause the question-first tactic effectively threatens to thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted, and because the facts [there did] not reasonably support a conclusion that the warnings given could have served their purpose," the second post warning statement was inadmissible.  *Id.* at 617.

The Third Circuit has clarified situations in which district courts should apply *Seibert* as opposed to *Elstad*.  *See United States v. Naranjo*, 426 F.3d 221, 231-32 (3d Cir. 2005).  Since *Seibert* was a plurality opinion, its holding is "viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds," which was the concurring opinion of Justice Kennedy.  *Naranjo*, 426 F.3d at 231-32 (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)).  Accordingly, "[u]nless the agents deliberately withheld warnings," a defendant's *Miranda* claim is governed by *Elstad*.  *Naranjo*, 426 F.3d at 232.  However, "[i]f the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the

postwarning statement is made." *Id.* (quoting *Seibert*, 124 S. Ct. at 2616 (Kennedy, J .

concurring)).

<blockquote>

**a.** **The decision to employ a two-step interrogation technique was deliberate.**

</blockquote>

There is every indication in this case that TFO Kreider made a deliberate choice to

circumvent *Miranda*'s safeguards when he interrogated Mr. Rashwan at the State Game Lands

Gun Range and then participated in Agent Garcia's formal interrogation shortly thereafter at the

Allentown Regional FBI Field Office.  It is not necessary for the detectives to admit they

purposely utilized the question first, warn later technique at the suppression hearing.  *See Seibert*,

542 U.S. at 617 n. 6 ("[b]ecause the intent of the officer will rarely be as candidly admitted as it

was here . . . the focus is on facts apart from intent that show the question-first tactic at work.").

When Agents Garcia and Dvorak arrived at the gun range, TFO Kreider and Warden Furmato

indicated to him that they had already gotten Mr. Rashwan to admit he was the one shooting (and

therefore possessing) the Stag Arms firearm and that he had been to Heritage Guild to shoot it in

the previous weeks.  They also obtained incriminating information about his purchase of the

firearm.  This was a deliberate attempt to obtain an un-Mirandized statement that would later be

reduced to writing following his formal arrest.

This is not a case where the police made a "rookie mistake" or proceeded on an incorrect

but reasonable assumption that *Miranda* warnings were not required under the circumstances.

*See Naranjo*, 426 F.3d at 232-33 (remanding to the district court to determine whether the

omission of *Miranda* warnings before the first statement was a "rookie mistake" or a deliberate

interrogation technique); *see also United States v. Naranjo*, 223 Fed. Appx. 167, 169 (3d Cir.

2007) (not precedential) (affirming district court's denial of *Seibert* motion on remand where the

officers administered some *Miranda* warnings and mistakenly believed full warnings were not

required until defendant "was placed under arrest"); *Reinert v. Larkins*, 379 F.3d 76, 87, 91 (3d Cir. 2004) (officer's initial *Miranda* violation in an ambulance was a "simple failure" and not "part of a larger, nefarious plot"); *United States v. Medina*, 2008 U.S. Dist. LEXIS 39036, at *34-37 (D. Kan. May 12, 2008) (denying a *Seibert* motion where the interrogating officer had a mistaken but reasonable belief that *Miranda* warnings were unnecessary "because he was acting in an administrative capacity"); *United States v. Stewart*, 536 F.3d 714, 716, 721-22 (7th Cir. 2008) (affirming the district court's denial of a *Seibert* motion where the interrogating officer had a mistaken belief that the defendant was not in custody at the time of the first unwarned statement). Nor is this a case where the officers justifiably asked questions about weapons found in a house "due to officer safety concerns." *United States v. Latz*, 162 Fed. Appx. 113, 120 (3d Cir. 2005).

Here, TFO Kreider and Warden Furmato purposely elicited incriminating information from Mr. Rashwan knowing it would be captured on their body worn cameras. Warden Furmato witnessed Mr. Rashwan shooting the gun, and video footage shows his brothers setting up his paper targets for him. There is no reason why Warden Furmato's testimony about what he saw and the reasonable inferences a jury could draw from the video footage would not be enough to establish possession of the firearm at trial. Law enforcement's attempt to elicit unwarned statements confirming the same was clearly a deliberate attempt to shore up the government's case. Their decision to continue their permit-checking ruse while they awaited the FBI rather than arresting him themselves without providing proper prophylactic Fifth Amendment warnings was purposeful and designed to let the "cat out of the bag" so a formal confession could later be recorded.

        **b.**     **Law enforcement failed to take sufficient curative measures, rendering the midstream *Miranda* warnings ineffective.**

The officers and agents also failed to take sufficient curative measures to sanitize the second interrogation from the initial *Miranda* violation, as Justice Kennedy's concurring opinion requires. *See Seibert*, 542 U.S. at 622 (Kennedy, J . concurring). The "curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Naranjo*, 426 F.3d at 232 (quoting *Seibert*, 124 S. Ct. at 2616 (Kennedy, J. concurring)). "[A]n additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient." *Seibert*, 542 U.S. at 622 (Kennedy, J. concurring). Justice Kennedy also noted that "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.* (citation omitted).

Additionally, the plurality noted that the following factors are relevant to determining the effectiveness of midstream *Miranda* warnings: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615 (plurality opinion); *see also United States v. Kiam*, 432 F.3d 524, 532-33 (3d Cir. 2006) (finding the district court's analysis of the plurality's five factors was "not faulty," but that it was unnecessary because the failure to administer *Miranda* warnings was inadvertent); *United States v. Stewart*, 388 F.3d 1079, 1089-90 (7th Cir. 2004) (discussing relevant "curative measures" explained in Justice Kennedy's concurring opinion as well as the plurality's factors). A comprehensive review of all these relevant factors demonstrates that the *Miranda* warnings administered to Mr. Rashwan could not have possibly served their purpose.

With respect to the curative measures mentioned in Justice Kennedy's concurring opinion, Agent Garcia and TFO Kreider did not advise Mr. Rashwan that his first statement would (or might) be inadmissible because of the initial *Miranda* violation.  *See Naranjo*, 426 F.3d at 232 (quoting *Seibert*, 124 S. Ct. at 2613).  Additionally, there was not a break in time between the two interrogations sufficient for Mr. Rashwan to understand the interrogation had "taken a new turn."  *Seibert*, 542 U.S. at 622 (Kennedy, J. concurring).  Indeed, the second interrogation took place almost immediately after the first set of on-scene statements were made, presumably as soon as (or soon after) he was taken to the FBI Allentown office.  A reasonable person in Mr. Rashwan's position would not have viewed each interrogation as separate and distinct, but rather as a continuous process to compile incriminating evidence regarding his firearm purchase and possession.  The absence of both the curative measures mentioned in Justice Kennedy's concurring opinion weighs heavily in favor of suppression.

Application of the plurality's factors also strongly supports a finding that the midstream warnings were ineffective.  With respect to the first factor, the "completeness and detail of the questions and answers in the first round of interrogation," *see Seibert*, 542 U.S. at 615, the initial interrogation at the firing range was lengthy and fairly detailed.  Mr. Rashwan talked to TFO Kreider about the firearm in great detail, where he had gone to shoot it, and provided information about the seller as well as where and how he purchased it from being in the online forum.

Second, as noted above, the two sets of questions overlapped significantly.  *Seibert*, 542 U.S. at 615.  The second written statement covers the same topics.  Agent Garcia and TFO Kreider simply added to the questions already asked of Mr. Rashwan by asking him about his immigration status, the immigration applications he is charged with falsifying, and a few other topics such as his online activities and his marriage.  This is certainly not a case where the police

let one question slip in violation of *Miranda* and then obtained a lengthy and detailed second statement which was properly warned and sanitized from the initial *Miranda* violation. TFO Kreider spent the better part of an hour under the ruse of cross-checking permit and firearm numbers to obtain much of the same information that was later memorialized at the FBI Office. It is of no consequence that some additional lead-in and follow-up questions were asked during the second interrogation. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 428 (6th Cir. 2008) ("[w]hile the exact questions did not overlap, the post-*Miranda* question resulted from the knowledge gleaned during the initial questioning . . . .").

The third and fourth factors are the timing and setting of the two rounds of interrogation and the continuity of the police officers. *Seibert*, 542 U.S. at 615. The two interrogations occurred within close temporal proximity to each other. This is similar to the two interrogations in *Seibert*, where the second statement was ruled inadmissible. *Id.* at 616. The second round of interrogation occurred inside the Allentown Regional FBI Office shortly after Mr. Rashwan was arrested at the shooting range and transported. TFO Kreider was present during both interrogations, with the help of Agent Garcia for the second interrogation. Therefore, the close temporal proximity of the interrogations and the continuity of police personnel are manifest.

Finally, with respect to the degree to which the questions treated the two rounds of interrogation as continuous, it is difficult to discern from the discovery whether the second round of questions explicitly referred to the first statement as was the case in *Seibert* because the FBI prepares a summary of interviews rather than a written, verbatim question and answer like the Philadelphia Police. *Id.* at 616-17. The FBI Form 302 memorializing Mr. Rashwan's stationhouse statement indicates he admitted owning the rifle he had in his possession at the firing range, indicating some reference back was made to the initial encounter. Nevertheless, the

facts and circumstances indicate the two sets of questioning were part of a continuous process.  It is clear the agents asked Mr. Rashwan who owned the rifle at the beginning of the interrogation, which he had already admitted to TFO Kreider and Warden Furmato on-site.  Furthermore, the substantially overlapping contents of the two sets of questioning would suggest to any reasonable suspect in Mr. Rashwan's position that the agents were merely seeking to obtain in writing the information they already received from the first statement.

Therefore, it is clear a deliberate two-step interrogation technique was utilized by law enforcement in this case.  The circumstances indicate that TFO Kreider and Warden Furmato clearly sought to obtain oral incriminations so the information could later be memorialized in writing after agents administered proper *Miranda* warnings following his formal arrest.  There is *no other* explanation for why they repeatedly asked the three men about the firearm when they allegedly saw Mr. Rashwan possessing it with their own eyes.  Moreover, the agents failed to interject sufficient curative measures to sanitize the second round of interrogation from the deliberately unwarned first statement.  "These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the [Defendant's] shoes would not have understood them to convey a message that []he retained a choice about continuing to talk."  *Seibert*, 542 U.S. at 617.  Mr. Rashwan's second statement at the FBI Allentown Office must therefore be suppressed.

## II.   MOTION TO DISMISS COUNTS ONE AND TWO OF THE SUPERSEDING INDICTMENT

Mr. Rashwan rests on the written and oral arguments made concerning this Motion.

## III.   MOTION TO DISMISS ON GROUNDS OF SELECTIVE PROSECUTION, SELECTIVE ENFORCEMENT, AND ABUSE OF PROCESS AND MOTION TO COMPEL DISCOVERY.

Mr. Rashwan rests on the briefs previously filed with respect to these Motions, but writes to clarify:

Motions for discovery to support a selective enforcement or prosecution are governed by the popular framework announced in *United States v. Armstrong*, 517 U.S. 456 (1996) and *United States v. Bass*, 536 U.S. 862 (2002) (per curiam).  To prevail on a substantive motion to dismiss based on selective enforcement or prosecution, the defendant must show clear evidence of discriminatory effect and discriminatory intent/purpose.  This rigorous standard "requires evidence that similarly situated individuals of a differen[t] race or classification were not prosecuted, arrested, or otherwise investigated."  *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017) (citations omitted).

 Recognizing criminal defendants will not often have access to the type of evidence that would meet the standard for immediate dismissal on equal protection grounds, *Armstrong* and *Bass* set forth the standard to obtain discovery to support a subsequent motion to dismiss for selective *prosecution*.  "[A] successful discovery motion can rest on 'some evidence,'" which "must still include a showing that similarly situated persons were not prosecuted."  *Id.* at 214-15. The defendant's "showing must be 'credible' and cannot generally be satisfied with nationwide statistics."  *Id.* at 215.  The Third Circuit has noted that *Armstrong* and *Bass* "were grounded in part on the special solicitude courts have shown to prosecutors' discretion."  *Id.* at 216.

However, when a selective *enforcement* claim is raised, the "special solicitude" afforded to prosecutors' decisions "does not inevitably flow to the actions of law enforcement or even to prosecutors acting in an investigative capacity."  *Id.* at 219.  As such, the Third Circuit held that "motions for discovery seeking information on putative claims of unconstitutional selective enforcement are not governed by strict application of the *Armstrong/Bass* framework.  *Id.* at 220.

26

For selective enforcement or "'mixed' claims that involve prosecutors acting in investigative or other capacities (in short, performing functions that ordinarily would not draw absolute immunity)," the standard is different. "While *Armstrong/Bass* remains the lodestar, a district court retains the discretion to conduct a limited pretrial inquiry into the challenged law enforcement practice on a proffer that shows 'some evidence' of discriminatory effect." *Id.* at 220-21. "The proffer must contain reliable statistical evidence, or its equivalent, and may be based in part on patterns of prosecutorial decisions . . . *even if* the underlying challenge is to law enforcement decisions." *Id.* at 221 (emphasis in original). Unlike in selective prosecution claims, defendants alleging selective enforcement are not at the initial stage required to "provide 'some evidence' of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement." *Id.* The proffer must merely be sufficiently strong to "support a reasonable inference of discriminatory intent and non-enforcement." *Id.*

Once this standard has been met, the district court retains the discretion to conduct a limited and measured pretrial inquiry while being mindful of "judicial economy and the need to avoid protracted pretrial litigation of matters collateral to the upcoming trial—as well as the need toa void impinging on other areas of executive privilege." *Id.* The Third Circuit suggested that possible areas of district court inquiry can be "testimony, in person or otherwise, of case agents or supervisors, and the *in camera* analysis of policy statements, manuals, or other agency documents." *Id.* The Seventh Circuit's decision in *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015), cautioned the district court to take "'measured steps' to determine the scope and boundaries of discovery," but that "[i]f the inquiry gave the district court reason to believe that similarly situated persons would not have been pursued by law enforcement, *in camera*

disclosure of targeting criteria might be called for." *Washington*, 869 F.3d at 218 (citing *Davis,* 793 F.3d at 722-23). "If the trail of breadcrumbs continued, additional targeted inquiries might be justified; and if the obtained information crossed the *Armstrong/Bass* threshold, the discovery 'could be extended to the prosecutor's office." *Id.* (citing *Davis*, 793 F.3d at 722-23).

Given the framework established above, Mr. Rashwan submits that he has submitted some evidence of discriminatory effect sufficient for this Court to conduct the limited and measured pretrial inquiry set forth in *Washington*. Discovery of items 11 through 16 contained in Mr. Rashwan's Motion to Compel Discovery (Doc. No. 93) should be reviewed *in camera*, and if necessary, passed to the defense to support further measured inquires if appropriate. *See Washington*, 869 F.3d at 221. At a minimum, the Court should order the FBI (the prosecuting agency in this case) and ATF (the agency charged with regulating the sales or attempted sales of firearms) to produce statistics as to the race of defendants investigated for violations of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(1)(A) and the races of defendants who were referred to the United States Attorney's Office for prosecutions of those offenses and any relevant policy manuals or statements pertaining to when prosecutions under those statutes should be pursued by the FBI, ATF and Department of Justice.

## IV.    CONCLUSION

For the reasons set forth above, Mr. Rashwan submits that suppression and measured pretrial discovery pertaining to selective enforcement are warranted.

Respectfully submitted,

*/s/ Jonathan McDonald*
JONATHAN McDONALD
Assistant Federal Defender

<u>**CERTIFICATE OF SERVICE**</u>

I, Jonathan McDonald, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I filed Defendant's Omnibus Pretrial Motion via the Court's Electronic Filing (ECF) system, which sent notification to Mary A. Futcher and Danielle Rosborough, Assistant United States Attorneys, Suite 1250, 615 Chestnut Street, Philadelphia, Pennsylvania 19106, via their email address Mary.Futcher@usdoj.gov and Danielle.Rosborough@usdoj.gov.

*/s/ Jonathan McDonald*
JONATHAN McDONALD
Assistant Federal Defender

DATE: January 18, 2023