**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. 22-118 |
| | : | |
| MAHMOUD ALI AHMED RASHWAN | : | |

**<u>MEMORANDUM OPINION</u>**

**SCHMEHL, J. <u>/s/ JLS</u>**                                      **July 11, 2023**

Pursuant to the Superseding Indictment in this case (ECF No. 39), a grand jury has charged Defendant Mahmoud Ali Ahmed Rashwan with two counts of possession of a firearm by an alien illegally or unlawfully in the United States in violation of 18 U.S.C. § 922(g)(5)(A) and one count of making false statements to a federal firearms licensee in violation of 18 U.S.C. § 924(a)(1)(A). On August 24, 2022, Mr. Rashwan filed a *Motion to Dismiss on Grounds of Selective Prosecution, Selective Enforcement, and Abuse of Process.* (ECF No. 56.) Mr. Rashwan argues that although Pennsylvania authorities investigate the denial of firearms transactions, such investigations rarely are referred to federal authorities or lead to prosecution. That fact, together with Mr. Rashwan's interactions with various officials prior to and after his arrest, leads Mr. Rashwan to believe that the Government targeted him based on his nationality, race, and religion. Accordingly, he requests dismissal of this criminal action for selective prosecution and enforcement. In its opposition, the Government argues that Mr. Rashwan has failed to identify similarly situated individuals that have not been prosecuted and that, regardless, the context of the officials' discussion of Mr. Rashwan's race and religion indicates that officials lacked the requisite discriminatory purpose. For the reasons set forth below, Mr. Rashwan's Motion is denied.

## I.   ALLEGED FACTS

The alleged events relevant to this motion largely took place on March 12, 2022, at a shooting range on state game lands in New Tripoli, Pennsylvania.  (Def.'s Br. 2, ECF No. 56.) While Mr. Rashwan and his two brothers were shooting at the range, an on-duty game warden approached them and conducted a routine inspection of Mr. Rashwan's firearm and range permit. (*Id.* at 3; *see also* ECF No. 67-1 at 2–4 (transcript of game warden's body camera footage).)  The game warden returned to also collect the group's driver's licenses.  (Gov.'s Br. 18, ECF No. 67.) While reviewing these documents, the game warden received a call from an FBI Task Force Officer ("TFO"), who instructed the game warden to prevent Mr. Rashwan and his brothers from leaving until FBI special agents arrived.  (*Id.*)[1]  The game warden then spoke with another game warden (identified in the below transcript as "UK") in a conversation which, Mr. Rashwan claims, evidences discriminatory intent based on his race:

> GW:   Hey bud I'll call you back.
> UK:   Well what is going on?  Because everybody is calling me and asking me what you've got going on because cause you're not communicating.
> GW:   Uh I'm not really in the know of what these guys are needed for but I'm holding them here.
> UK:   What are they doing?
> GW:   They're shooting.
> UK:   They're shooting?
> GW:   Yeah.
> UK:   At the range?
> GW:   Yes.
> UK:   Okay what's so bad about that?
> GW:   I don't know.  But uh [TFO] needs them.
> UK:   Who are they?
> GW:   Um one is uh they're like all named Rashwan.

---

[1]     Unknown to the game warden, the FBI was investigating Mr. Rashwan and had previously obtained a search warrant authorizing cell-site location and pen register information for his cell phone.  (Gov.'s Br. 14.)  After the FBI learned, pursuant to the search warrant, that Mr. Rashwan was near the shooting range, an FBI agent had contacted the TFO, precipitating the TFO's call to the game warden.  (*Id.* at 14–15.)

UK:     What's the last name?
GW:    Uh Rashwan.
UK:     Rashwan?
GW:    Yeah.
UK:     Huh well what were they doing.
GW:    Well no they're just they're just here.  I pulled in and I noticed the car like their car is parked in bumfuck nowhere and they're down here like they didn't know where the parking lot was.
UK:     Oh?
GW:    Um and
UK:     And [TFO] just told you to hold them?
GW:    He called me right when I was about to check them he was like **hey is there like a middle eastern guy there right now**?  And I'm like yeah three of them and he's like go to your vehicle or somewhere secure I gotta call you.  So I got in here and he said I'm headed my way right now just hold them there.  I'm like okay.  That's all I know.
UK:     Hm well if you guys need anything let me know.

(ECF No. 67-2 at 2–3 (emphasis added).)  The on-duty game warden then returned to the range and continued chatting with Mr. Rashwan and his brothers until the TFO arrived.  (*Id.* at 4–6.)  The TFO asked Mr. Rashwan about the firearm, its attachments, and where Mr. Rashwan had acquired it.  (*Id.* at 6–9.)  The TFO then took Mr. Rashwan's documentation and advised him that he was only supposed to have one guest at the range.  (*Id.* at 10–11.)  The TFO left to take a call from a supervisory special agent, who requested an update on the situation for the benefit of the two special agents *en route* (identified below as FBI SA-1 and -2).  (ECF No. 67-3 at 12.)  The TFO explained as follows:

> Sure so upon notification from FBI SA-1 I reached out to our district officer that covers . . . [t]he public range here in New Tripoli and my officer [the on-duty game warden] was already on scene um just out of coincidence.  He was here doing routine patrol.  **He encountered the three Middle Eastern individuals which we have IDs for**. One to include Mahmoud Rashwan target subject. . .  I've been out for the last couple of minutes talking with them.  Um I've gotten Rashwan to admit that the rifle that he was shooting um belongs ton [*sic*] him um he's shooting a 556 AR15 style rifle.  Um I believe our officer was able to obtain body camera footage of him shooting. Because they continued to shoot while he did his routine checks. . . .

> Um I've been out talking to them um they're being cooperative with
> me because they don't know what's going on necessarily.  **They
> admitted to um they're from Egypt**.  Rashwan has admitted to
> transactions and shooting over at Heritage Guild which we kind of
> already knew.  Um so that's kind of where we are at.  We are kind
> of stalling trying to wait until FBI SA-1 can get here and or FBI
> SA-2.

(*Id.* (emphasis added).)  In a subsequent conversation, the special agents *en route* requested that

the TFO secure the firearm and ammunition.  Mr. Rashwan and his brothers were patted down and

waited in vehicles parked at the range until the special agents arrived, at which point Mr. Rashwan

was formally arrested.  (Gov.'s Br. 22.)

For the first time in reply, Mr. Rashwan provides additional allegations of discriminatory

statements.  He claims that body camera footage not transcribed for the Court reveals that at the

shooting range, a special agent questioned one of Mr. Rashwan's brothers by asking if he "ever

heard [Mr. Rashwan] talking about . . . something extremist"; if the brother or Mr. Rashwan are

"religious"; if Mr. Rashwan has ever looked at "extremist" or "ISIS material" on the internet; and

if they "fast or go to any mosques."  (Def.'s Reply 20, ECF No. 94.)  Mr. Rashwan also claims

that the same agent later divulged to other officials at the scene that "I was terrified in there"

because Mr. Rashwan's brother "said '[he] was Muslim.'"  (*Id.*)  Finally, Mr. Rashwan alleges that

during questioning at the FBI station in Allentown, an agent explained that Mr. Rashwan was being

detained because he was "from a country of interest."  (*Id.* at 19.)

Also for the first time in reply, Mr. Rashwan challenges the initiation of the FBI's

investigation into his conduct.  He first notes that few firearms denial investigations are referred

to federal authorities (as opposed to state and municipal police departments), and few

investigations result in prosecutions.  (*Id.* at 8.)  Mr. Rashwan next argues that prior to his arrest

at the New Tripoli shooting range, he successfully cleared background checks on five occasions

at another range.  (*Id.* at 16.)  Mr. Rashwan maintains that from these circumstances, the Court can

infer that the FBI must have selected him for enforcement based solely on "his Muslim-Arab surname." (*Id.*)

Similarly, concerning the Government's decision to prosecute this case, Mr. Rashwan points to a 2018 report from the Government Accountability Office that found that only "a small percentage of individuals who falsify information on a firearms form" are prosecuted, and the Government should therefore consider "us[ing] warning notices for standard denials in lieu of prosecution." (Def.'s Br. Ex. A at 2, 44, ECF No. 56-1; *see also* Def.'s Br. 7.) He also cites an ATF best practices guide that recommends that "[p]rosecutors' offices should realign resources to address violent crimes," including by "more fully and intentionally prosecut[ing] the most dangerous repeat offenders." (Def.'s Br. Ex. B at 30, ECF No. 56-2; *see also* Def.'s Reply 11–14 (discussing similar reports).)

Because Mr. Rashwan changed counsel since the filing of the foregoing briefing, and considering Mr. Rashwan's numerous *pro se* filings, the Court requested that his new attorney address which motions he adopted, adopted with modifications, or withdrew. Mr. Rashwan's attorney then adopted the present selective prosecution and enforcement claims as set forth in the original briefing, with the modification that if the Court is not willing to dismiss the Superseding Indictment based on these allegations alone, the Court should instead find that Mr. Rashwan's preliminary evidence warrants further discovery concerning the Government's alleged discrimination. (Def.'s Omnibus Mot. 26–28, ECF No. 120.)

## II.    LEGAL STANDARDS

The Supreme Court has explained that "courts presume that [prosecutors] have properly discharged their official duties," because "they are designated by statute as the President's delegates" in faithfully executing the nation's laws; courts are not well-equipped to assess key factors such as "the Government's enforcement priorities"; and courts should take care "not to

unnecessarily impair the performance of a core executive constitutional function." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Accordingly, "[i]n the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in his discretion.'" *Id.* at 464 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)). That said, "a prosecutor's discretion is 'subject to constitutional constraints,'" such as "that the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Id.* (first quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979), and then quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).

Courts evaluate substantive claims for selective prosecution and enforcement under the same standard:  a defendant bears the burden of "provid[ing] 'clear evidence' of discriminatory effect and discriminatory intent" or purpose. *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017) (gathering cases). Establishing the first prong, discriminatory effect, "generally requires evidence that similarly situated individuals of a difference race or classification were not prosecuted, arrested, or otherwise investigated." *Id.*; *see also United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989). Establishing the second prong, discriminatory intent or purpose, requires "show[ing] that the decision to prosecute" or enforce "was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor . . . ." *Schoolcraft*, 879 F.2d at 68.

As the *Washington* court explained, "[a] criminal defendant, however, will not often have access to the information, statistical or otherwise, that might satisfy a 'clear evidence' burden." 869 F.3d at 214. Accordingly, when merely seeking discovery, defendants face a lower burden, though this burden differs slightly between claims of selective prosecution and selective

enforcement.  To support a selective prosecution claim, "a successful discovery motion can rest on 'some evidence'"—not "clear evidence"—of discriminatory effect and discriminatory intent. *Id.* (citing *United States v. Bass*, 536 U.S. 862, 863 (2002)).  This seemingly lower burden nonetheless remains challenging:  "'[s]ome evidence' must still include a showing that similarly situated persons were not prosecuted," and "the defendant's showing must be 'credible' and cannot generally be satisfied with nationwide statistics."  *Id.* at 214–15.  The Third Circuit noted that at the time of writing *Washington*, "neither the Supreme Court nor this Court has ever found sufficient evidence to permit discovery of a prosecutor's decision-making policies and practices." *Id.* at 215.

A motion for discovery concerning a selective enforcement claim, however, faces yet another lessened burden, because "the special solicitude shown to prosecutorial discretion . . . does not inevitably flow to the actions of law enforcement, or even to prosecutors acting in an investigative capacity."  *Id.* at 219.  Because of this distinction, the Third Circuit explained the relevant standard as follows:

> While *Armstrong/Bass* remains the lodestar, a district court retains the discretion to conduct a limited pretrial inquiry into the challenged law-enforcement practice on a proffer that shows "some evidence" of discriminatory effect.  The proffer must contain reliable statistical evidence, or its equivalent, and may be based in part on patterns of prosecutorial decisions . . . even if the underlying challenge is to law enforcement decisions.  Distinct from what is required under *Armstrong/Bass*, a defendant need not, at the initial stage, provide "some evidence" of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement.  However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement.

*Id.* at 220–21.  The Court considers Mr. Rashwan's selective enforcement and prosecution claims in turn.

- 7 -

### III.    ANALYSIS

#### A.    Selective Enforcement

Although the standard for Mr. Rashwan's discovery request as to selective enforcement is less demanding than that for his discovery request as to selective prosecution, his showing must nonetheless "be strong enough to support a *reasonable inference* of discriminatory intent and non-enforcement."  *Washington*, 869 F.3d at 221 (emphasis added).  For the following reasons, Mr. Rashwan's allegations do not support any such reasonable inference.

As reproduced more fully above, Mr. Rashwan challenges the following statements:  the TFO's question to the on-duty game warden of whether there was a "Middle Eastern guy" at the shooting range; the summary provided by the TFO to a supervisory special agent, which involved the TFO again referencing Mr. Rashwan's "Middle Eastern" ethnicity and his "admission" that he was from Egypt; an agent's interaction with one of Mr. Rashwan's brothers, which included questions about their religious practices and whether Mr. Rashwan engaged with "extremist" or "ISIS material" on the internet; an agent's disclosure to other agents that she felt "terrified" while questioning Mr. Rashwan's brother because the brother said he was Muslim; and an agent's explanation that Mr. Rashwan was being detained because he was "from a country of interest." Finally, Mr. Rashwan reasons that because his previous visits to shooting ranges were cleared by a background check, the FBI must have had no reason to select Mr. Rashwan for the instant enforcement other than "his Muslim-Arab surname."

Context resolves the potentially problematic nature of these remarks.  First, the on-duty game warden was not previously familiar with Mr. Rashwan or the ongoing investigation into his conduct.  Accordingly, the TFO's question about whether the game warden had seen a "Middle Eastern guy" evidences an attempt to offer the game warden an easy way to identify Mr. Rashwan—not an invidious scheme to harass any Middle Eastern person who happened to be at

the range.  Second, because the TFO knew of Mr. Rashwan's immigration status and that such status rendered his possession of a firearm illegal, the TFO's reference to Mr. Rashwan's "admission" that he was from Egypt most obviously evidences the TFO's belief that Mr. Rashwan had divulged potentially incriminating information—not that the TFO believed that Egyptian nationality was somehow criminal on its own.  This conclusion is reinforced by the TFO's subsequent remark that Mr. Rashwan also "admitted" to having previously used a firearm at another range.  Finally, the remaining allegations are neutralized by the fact that the FBI was investigating Mr. Rashwan for not only allegedly lying on a firearms form and unlawfully possessing firearms, but also for potentially lying on immigration documents regarding his military history and for other classified reasons.[2]  Given these circumstances, Mr. Rashwan's allegations do not support a reasonable inference of discriminatory intent.

Mr. Rashwan's allegations concerning discriminatory effect are even thinner.  Mr. Rashwan's references to the typical investigation of denied firearms sales do not address the full scope of the FBI's investigation in this case.  Mr. Rashwan had not simply erroneously filled out a firearms form and then been targeted at a shooting range by officials looking to harass a "Middle Eastern guy."  Instead, he allegedly lied on immigration and firearms documents, persistently sought out alternative, off-the-books methods of acquiring firearms, and ultimately obtained such a firearm and ammunition.  Nothing in Mr. Rashwan's filings supports a reasonable inference of non-enforcement in other similar cases.

---

[2]     The Court previously reviewed, *ex parte* and *in camera*, classified information relating to Mr. Rashwan.  The Court determined that this information was not relevant and helpful to the defense.  (*See* Order, ECF No. 110.)

B.      **Selective Prosecution**

Mr. Rashwan's request for discovery on his selective prosecution claim is subject to a comparatively higher burden that requires a "credible" showing of "some evidence"—not based on "nationwide statistics"—that similarly situated persons were not prosecuted, and the prosecution acted with invidious discriminatory intent.  *Washington*, 869 F.3d at 214–15. Individuals are similarly situated if they are "alike in all relevant aspects."  *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).  In other words, supporting statistics must concern not just the relevant charges but rather those charges as brought against similarly situated defendants.  *Bass*, 536 U.S. at 863–64 ("[R]aw statistics regarding overall charges say nothing about charges brought against similarly situated defendants.").

Although the bulk of Mr. Rashwan's allegations relate to the conduct of law enforcement, not the prosecution team, he offers some argument as to the latter.  Namely, he focuses on the proposition, repeated in reports from various sources, that prosecuting violent crimes or individuals with violent criminal histories should take precedence over prosecuting the denial of attempted firearms sales to nonviolent prohibited persons.  These documents reflect a policy priority but do not provide any data indicating that the Government declined to prosecute non-Egyptian or non-Muslim aliens charged with falsely answering firearms forms and unlawfully possessing firearms.  *Cf. Armstrong*, 517 U.S. at 470 (rejecting claim of racial bias where the evidence "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted"); *United States v. Hedaithy*, 392 F.3d 580, 608 (3d Cir. 2004) (denying selective prosecution claim where the proffered evidence did not differentiate between a test-taker "who cheats by merely copying his

neighbor's answers" and one "who paid an imposter to take the . . . exam so that he could obtain admission to an educational institution and remain eligible to reside legally in the United States").

Further, although the statistics cited by Mr. Rashwan may suggest that his case is uncommon, Mr. Rashwan, according the Government's allegations, is an uncommon defendant— and for reasons unrelated to his nationality, race, or religion.  As discussed above, he was not merely denied a firearm for making an innocuous error on an ATF form.  Instead, the Government has alleged a history of lying on immigration and firearms forms, potentially with the intent to skirt restrictions on gun possession.  The Government has coupled this alleged conduct with allegations that in the days following Mr. Rashwan's firearms denial, he incessantly searched for other pathways to acquire firearms that did *not* involve filling out ATF documents—and, indeed, he ultimately succeeded in acquiring an assault rifle and potentially hundreds of rounds of ammunition.  (Gov.'s Br. 11–13 (detailing Mr. Rashwan's discussions with 21 users on an online forum concerning firearms sales).)  Statistics concerning the number of denied firearms transactions that did *not* result in prosecution—cases that may involve material factual differences from Mr. Rashwan's—do not provide "some evidence" that non-Egyptian or non-Muslim aliens engaging in conduct similar to Mr. Rashwan's have been prosecuted differently.  Mr. Rashwan has failed to show that these cases of non-prosecution involved "circumstances [that] present no distinguishable prosecutorial factors that might justify making different prosecutorial decisions with respect to them."  *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996).[3]

---

[3]     Alternatively, Mr. Rashwan argues that "the extraordinary nature of the pattern of conduct alleged—amounting to harassment—allow[s] the court to infer that similarly situated persons were not receiving the same extraordinary treatment," despite that Mr. Rashwan has not specifically identified any such cases. *Patterson v. Strippoli*, 639 F. App'x 137, 145 (3d Cir. 2016) (Rendell, J., concurring in part and dissenting in part) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 748 (7th Cir. 2012)).  Cases like *Geinosky* concern a "class-of-one" equal protection claim, which

From Mr. Rashwan's allegations, the Court can most reasonably conclude that the Government decided to investigate and prosecute Mr. Rashwan's case based on the alarming nature of his alleged conduct—not based on his nationality, race, or religion. Accordingly, the Court denies Mr. Rashwan's request for further discovery concerning selective prosecution. Because Mr. Rashwan has not met the "some evidence" standard, his substantive selective prosecution claim—governed by a "clear evidence" standard—must also fail.

## IV.   CONCLUSION

For the foregoing reasons, the Court denies Mr. Rashwan's Motion. A corresponding order accompanies this memorandum.

---

"protect[s] individuals against purely arbitrary government classifications, even when a classification consists of singling out just one person for different treatment for arbitrary and irrational purposes" (as opposed to different treatment based on membership in a protected class). *Geinosky*, 675 F.3d at 747. Such claims face "a high hurdle," *Patterson*, 639 Fed. App'x at 144, because there is a "strong presumption of the [Government's] actions' validity," *Russell v. City of Phila.*, 428 Fed. App'x 174, 177 n.2 (3d Cir. 2011) (citing *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)).

Whether Mr. Rashwan is pursuing a "class-of-one" theory here is unclear, but in any event, he has not shown that the when Government officials investigated his allegedly numerous misrepresentations on Government forms, his repeated efforts to obtain and use firearms, and his actual acquisition of a firearm and ammunition, those officials somehow "depart[ed] from some norm or common practice" and thereby engaged in "the irrational or malicious application of law enforcement powers." *Geinosky*, 675 F.3d at 747. As explained above, it is crystal clear that Mr. Rashwan was not investigated and prosecuted merely because he made an inadvertent mistake on a form.