IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. 22-118 |
| | : | |
| MAHMOUD ALI AHMED RASHWAN | : | |

MEMORANDUM OPINION

**SCHMEHL, J.** /s/ JLS                                                                                   July 27, 2023

Pursuant to the Third Superseding Indictment in this case (ECF No. 156), a grand jury has charged Defendant Mahmoud Ali Ahmed Rashwan with two counts of possession of a firearm by an alien illegally or unlawfully in the United States in violation of 18 U.S.C. § 922(g)(5)(A) and one count of making false statements to a federal firearms licensee in violation of 18 U.S.C. § 924(a)(1)(A).  Presently before the Court is Mr. Rashwan's *Amended Motion to Suppress Evidence Obtained from Unlawful Arrest* (ECF No. 55), in which he requests suppression of all evidence gathered on the date of his arrest.  Following a change in counsel, Mr. Rashwan filed his *Omnibus Pretrial Motion* (ECF No. 120), in which he challenges the ping warrant obtained by the Government and alleges *Miranda* violations.  The Court held suppression hearings on March 3, 2023, and April 11, 2023, to obtain testimony from the relevant law enforcement officers concerning Mr. Rashwan's arrest.  For the following reasons, the Court rejects Mr. Rashwan's arguments.

**I.     ALLEGED FACTS**

As detailed in other memoranda of this Court,[1] Mr. Rashwan overstayed his visitor visa, applied for asylum thereafter, and then had the visa expiration date retroactively extended. After that extended date, but while his asylum application remained pending, Mr. Rashwan allegedly rented firearms for use at the Heritage Guild of Easton Range on at least four occasions between May 30, 2021, and February 14, 2022. Mr. Rashwan then allegedly made misrepresentations when he completed ATF Form 4473 on February 26, 2022, in an attempt to purchase his own firearm. The next day, Mr. Rashwan allegedly began posting on an online gun forum in search of a firearms seller. By March 1, 2022, he had contacted numerous potential sellers on that site, and he allegedly successfully purchased a Stag Arms AR-15 Rifle, magazines, and hundreds of rounds of ammunition from one such seller on March 2, 2022. The Government further alleges that Mr. Rashwan continued to seek additional firearms on the online forum through March 5, 2022.

On March 9, 2022, Magistrate Judge Pamela Carlos issued the operative amended order and search warrant permitting the Government to obtain "[l]ocations of cell towers to which the Target Cell Phone connected," also known as cell site location information ("CSLI"). *See* Amended Order at 2, *United States v. Cellular Device Assigned Call Number (484) 274-9937 in the Custody or Control of AT&T Corp.*, No. 22-mj-00392 (E.D. Pa. March 9, 2022), ECF No. 8 [hereinafter Search Warrant Order]. The document describing information to be seized also included location data known as "enhanced 911" or "E-911" data. *See* Amended Affidavit in Support of an Amended Application for a Search Warrant attach. B, § I.a.iv., *United States v. Cellular Device Assigned Call Number (484) 274-9937 in the Custody or Control of AT&T Corp.*,

---

[1]     The Court has previously recounted many of the alleged facts in this case (see ECF Nos. 141, 145) and sets forth only those additional facts relevant to the present Motion.

No. 22-mj-00392 (E.D. Pa. March 9, 2022), ECF No. 5-1 [hereinafter Search Warrant Aff.]. According to the affidavit supporting the Government's search warrant application, E-911 data provide a user's location "either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers," usually resulting in more precise location data than CSLI. *Id.* ¶ 21. In either case, the search warrant contemplated the collection of future or prospective data, not historical data, for no more than 30 days. Search Warrant Order at 2–3.

The Government's affidavit noted Mr. Rashwan's frequent trips to the Heritage Guild range and that he "used the Target Cell Phone as his contact number on the Heritage Guild of Easton Range, LLC, Customer Information Form, that he signed on May 30, 2021." Search Warrant Aff. ¶ 1 n.1. That affidavit also claimed as follows:

> I further believe that evidence of violations of Title 18, United States Code, Section 924(a)(1)(a), and Title 18, United States Code, 922(g)(5)(A) & (B), will be obtained through the issuance of this search warrant, to include the identification of locations where Rashwan illegally possesses and discharges firearms at shooting ranges, and further attempts by Rashwan to illegally purchase firearms and submit false information on Forms 4473 to illegally acquire the firearms. The investigation has revealed that Rashwan's behavior has escalated from going to Heritage Guild where he rented firearms to shoot, to actually attempting to purchase a firearm as demonstrated by his completion of the Form 4473. For these reasons, based on my training and experience, and knowledge of this investigation, I believe that the issuance of this search warrant will provide evidence in furtherance of Rashwan's illegal activities.

*Id.* ¶ 20.

On March 12, 2022, at around 12:30 p.m., the location data obtained by the Government through this search warrant alerted agents to Mr. Rashwan's potential presence at a shooting range on state game lands in New Tripoli, Pennsylvania. Despite the snowfall and cold, Mr. Rashwan was indeed at that range with his two brothers and, by 12:28 p.m., had already been in contact with

the on-duty game warden, David Furmato.  Officer Furmato, who then was unaware of the Government's investigation into Mr. Rashwan, testified that he heard a number of shots in excess of the range's six-round limitation.  (Hr'g Tr. at 14:13–21, March 3, 2023, ECF No. 133.)  This violation prompted Officer Furmato to approach the group and conduct a routine inspection of Mr. Rashwan's firearm and range permit.  (*Id.* at 15:17–20.)  During this time, Officer Furmato chatted with Mr. Rashwan and his brothers about the weather, Mr. Rashwan's firearm, and the fact that the group had parked their car outside of the parking area.  (ECF No. 67-1 at 2–4.)  Officer Furmato permitted the group to continue shooting while he left to review the permit.  (*Id.* at 4.)  He briefly returned to gather the group's driver's licenses, during which time he again discussed the weather and the optic sight on the firearm.  (*Id.* at 5–6.)

At 12:43, as Officer Furmato reviewed the licenses in his vehicle, he received a call from FBI Task Force Officer ("TFO") William Tyler Kreider, who instructed him to prevent Mr. Rashwan and his brothers from leaving.  (Earlier, around 12:30 p.m., TFO Kreider had received a call from FBI Special Agent Eddie Garcia, who informed TFO Kreider that Mr. Rashwan appeared to be at the state game lands range.  (Hr'g Tr. at 46:19–47:12, Apr. 11, 2023, ECF No. 143.))  Seven minutes later, Officer Furmato then returned to the range and continued chatting with Mr. Rashwan and his brothers, during which time Mr. Rashwan indicated that the group visited the range "every once in a while," including in the prior week.  (ECF No. 67-2 at 5.)  TFO Kreider arrived only a few minutes later and asked, in light of the weather, how far away the group lived.  (*Id.* at 6.)  He then commented on Mr. Rashwan's firearm and asked him where he obtained it.  (*Id.* at 8.)  Mr. Rashwan mentioned coming to both the state game lands range as well as the Heritage Guild.  (*Id.* at 9.)  Around 1:00 p.m., TFO Kreider took Mr. Rashwan's documents and advised him that he was only supposed to have one guest at the range.  (*Id.* at 10–11.)  TFO Kreider left to

take a call from a supervisory special agent, who requested an update on the situation for the benefit of two FBI special agents *en route*. TFO Kreider explained as follows:

> I've gotten Rashwan to admit that the rifle that he was shooting um belongs ton [*sic*] him . . . . I've been out talking to them um they're being cooperative with me because they don't know what's going on necessarily. They admitted to um they're from Egypt. Rashwan has admitted to transactions and shooting over at Heritage Guild which we kind of already knew. . . . We are kind of stalling trying to wait until [the special agents] can get here . . . .

(ECF No. 67-3 at 12.)

In the meantime, the group chatted with Officer Furmato about living in New York and Allentown and growing up in Egypt. (ECF No. 67-2 at 12–13.) At 1:17 p.m., TFO Kreider returned to the range. The group discussed serving in the Egyptian miliary, and Mr. Rashwan left to use the restroom unaccompanied by either TFO Kreider or Officer Furmato. (*Id.* at 44–47; Hr'g Tr. at 10:4–12, Apr. 11, 2023.) Around 1:32 p.m., Mr. Rashwan indicated that the group was preparing to leave the range. (ECF No. 67-2 at 47.) This prompted TFO Kreider to reply, "Okay let me go make a phone call and see what's taking so long and what not." (*Id.*) After he then returned to his vehicle to contact the special agents, Officer Furmato again noted the cold weather, to which one of Mr. Rashwan's brothers replied, "Yeah I'm suffering we are suffering I mean in this weather." (*Id.* at 49.) Meanwhile, the special agents asked TFO Kreider to secure the firearm and ammunition, which he did at 1:34 p.m. (ECF No. 67-3 at 27.)

Citing a discrepancy with the firearm, TFO Kreider and Officer Furmato patted down the group. (ECF No. 67-2 at 57–58.) TFO Kreider patted down Mr. Rashwan separately and asked him about his purchase of the firearm through an online forum. (ECF No. 67-3 at 28–32.) After Mr. Rashwan requested to wait in his vehicle, TFO Kreider eventually permitted the group to wait in his and Officer Furmato's vehicles. (ECF No. 67-2 at 58, 62.) The special agents arrived at 1:59 p.m. and placed Mr. Rashwan under arrest. Reflecting on his encounter at the range with Mr.

Rashwan and his brothers, Officer Furmato testified that their exchange was "friendly," never "contentious," and never required him to draw his weapon. (Hr'g Tr. at 9:3–17, Apr. 11, 2023.) Mr. Rashwan was eventually transported to an FBI office in Allentown, where he received *Miranda* warnings, signed a form acknowledging his rights, and gave a statement to TFO Kreider and Special Agent Garcia. (*Id.* at 98:19–23, 100:14–102:13.)

Mr. Rashwan seeks to suppress the items seized during his arrest on March 12, 2022, including his Stag Arms AR-15 rifle, magazines, ammunition, and a weapon bag with miscellaneous gear. (ECF No. 120 at 2.) He also seeks to suppress potentially incriminating statements he made during questioning before and after the arrest, including statements about searching for and acquiring a firearm, having previously used firearms at various ranges, and his immigration status. (*Id.* at 3.)

## II.  ANALYSIS

The Fourth Amendment provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. This language requires that "all searches and seizures must be reasonable."[2] *Kentucky v. King*, 563 U.S. 452, 459 (2011). Subject to certain exceptions, "for a search or seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant . . . ." *United States v. Bey*, 911 F.3d 139, 144–45 (3d Cir. 2018) (citing *United States v.*

---

[2]  Concerning both the ping warrant and the March 12, 2022, questioning and arrest, discussed below, the Government has not argued that Mr. Rashwan lacked a "legitimate expectation of privacy" in the items and places searched by law enforcement. *United States v. Cortez-Dutrieville*, 743 F.3d 881, 883–84 (3d Cir. 2014). Accordingly, the Court begins with the next step of the analysis: whether such searches were reasonable.

*Brown*, 448 F.3d 239, 244 (3d Cir. 2006)); *see also King*, 563 U.S. at 459.  Pursuant to one such exception created by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 27 (1968), "police may 'conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot,'" *Bey*, 911 F.3d at 145 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  When no exception applies and the Government instead relies on a warrant, however, that warrant "may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity."  *King*, 563 U.S. at 459; *see also Bey*, 911 F.3d at 145.  If the Government failed to satisfy the foregoing requirements and obtained evidence "through unreasonable searches and seizures," such evidence "must be suppressed as 'fruit of the poisonous tree.'"  *Bey*, 911 F.3d at 144 (quoting *Brown*, 448 F.3d at 244).

   A.   **The Ping Warrant**

Mr. Rashwan argues that the search warrant issued by Judge Carlos, which permitted the Government to obtain location data from Mr. Rashwan's cell phone, was not supported by probable cause.[3]  Because the questioning and arrest of Mr. Rashwan on March 12, 2022, was predicated entirely on the Government's use of that location data, Mr. Rashwan argues, the Court should suppress all evidence obtained from that day.  For the following reasons, the Court finds that the Government's affidavit sufficiently connected Mr. Rashwan's cell phone and its location data to the crimes brought against him and provided Judge Carlos with the requisite basis to conclude that probable cause existed.

In reviewing Judge Carlos's decision, this Court may not "decide probable cause *de novo*" but rather must "determine whether 'the magistrate had a substantial basis for concluding [from

---

[3]   Mr. Rashwan has not challenged the particularity of the search warrant.

the relevant affidavit] that probable cause existed.'" *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). If this Court identifies that substantial basis, it "must uphold that finding even if a 'different magistrate judge might have found the affidavit insufficient to support a warrant.'" *Id.* (quoting *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993)). As the U.S. Supreme Court has instructed, "doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Id.* (quoting *Gates*, 462 U.S. at 237 n.10).

The Third Circuit has explained that because probable cause is a "fluid concept," it necessarily "turn[s] on the assessment of probabilities in particular factual contexts." *Id.* (quoting *Gates*, 462 U.S. at 232). In the traditional case, an affidavit should establish that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Gates*, 462 U.S. at 238). An affidavit may so establish through not only "direct evidence linking the crime with the place to be searched," but also inferences based on "the type of crime, the nature of the items sought, the suspect's opportunity for concealment and . . . where a criminal might hide [evidence]." *Id.* (quoting *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993)).

This case, however, is not the traditional case. Here, this Court confronts not a physical place to be searched for items subject to seizure, but rather a cell phone to be continuously monitored for its user's location. The U.S. Supreme Court has held that the Government must obtain a warrant supported by probable cause to collect a criminal defendant's historical CSLI, *see Carpenter v. United States*, 138 S. Ct. 2206, 2218–19 (2018), but other questions remain. As one example, the Court expressly limited its analysis to the collection of *historical* CSLI, not prospective, real-time location data. *Id.* at 2220. As another relevant example, the traditional "nexus" between the place to be searched and the items to be seized arguably breaks down in the

cell phone context: "Must the affidavit show only a fair probability that the phone's data 'will aid in a particular' investigation and disclose evidence of criminal activity," or, more stringently, "must it show, say, a fair probability that the phone itself is being used 'in connection with criminal activity'?" *United States v. Sheckles*, 996 F.3d 330, 338 (6th Cir. 2021) (first quoting *United States v. Christian*, 2017 WL 2274328, at *9 (E.D. Va. May 24, 2017), and then quoting *United States v. Powell*, 943 F. Supp. 2d 759, 779 (E.D. Mich. 2013)), *cert. denied*, 142 S. Ct. 717 (2021).

Notwithstanding this case's concern with *prospective* location data and the *Carpenter* Court's careful limitation of its ruling to *historical* CSLI, the Government does not contend that there was no Fourth Amendment "search" here (and therefore no need for the Government to obtain a warrant, even though it did so).[4]  Instead, the parties focus on whether the Government's

---

[4]  The *Carpenter* Court explained its concern for the collection of historical CSLI as follows:

> [T]he retrospective quality of the data . . . gives police access to a category of information otherwise unknowable. . . . Critically, because location information is continually logged for all of the 400 million devices in the United States—not just those belonging to persons who might happen to come under investigation—this newfound tracking capacity runs against everyone. Unlike with the GPS device in *Jones*, police need not even know in advance whether they want to follow a particular individual, or when.

138 S. Ct. at 2218. The prospective collection of data here, in contrast, required the Government to "know in advance" that it wanted to follow Mr. Rashwan in particular for the designated tine period. On the other hand, the E-911 data collected in this case, even more so than the CSLI discussed in *Carpenter*, "provide[] an all-encompassing record of the holder's whereabouts" that "reveal[s] not only [a person's] particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id.* at 2217 (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)).  Given the lack of briefing from the parties, the Court will not reach the issue of whether the circumstances of this case—namely, the real-time collection of E-911 data—compel the conclusion that unlike in *Carpenter*, there was no Fourth Amendment "search" here.  *Cf., e.g.*, *United States v. Hammond*, 996 F.3d 374, 389–92 (7th Cir. 2021) (no Fourth Amendment "search" where law enforcement obtained real-time location data, though such data was only CSLI, not E-911, and was only collected for fewer than six hours while the defendant was on public roads), *cert. denied*, 142 S. Ct. 2646 (2022).

affidavit provided Judge Carlos with a "substantial basis" to conclude that the warrant was supported by probable cause. This issue, in turn, requires the Court to consider the second of the foregoing unanswered questions—that is, must a defendant conduct criminal activity *through* the surveilled cell phone, or does it suffice for the cell phone's location data to reveal *any* criminal activity—even activity unrelated to the cell phone? *See Sheckles*, 996 F.3d at 338. Mr. Rashwan argues that the Government "should be required to establish a nexus between the cell phone and the suspected crimes, that the location data will likely lead to the discovery of evidence of the suspect's alleged crimes, or, at a minimum, establish there is probable cause to believe such a sweeping array of information is necessary to apprehend a suspect at large." (ECF No. 120 at 6–7.) The Government, in response, claims that its affidavit "meets even the most stringent" standard. (ECF No. 123 at 5.)

The Government affidavit certainly satisfies the more lenient standard recommended by the court in *Christian*, 2017 WL 2274328, at *9. There, the court argued compellingly as follows:

> Although a connection "between the item to be seized and criminal behavior[]" exists automatically when the items to be seized are fruits, instrumentalities, or contraband, *Warden v. Hayden*, 387 U.S. 294, 307 (1967), police may also seize "mere evidence," in which case "probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction[,]" *Andresen v. Maryland*, 427 U.S. 463, 483 (1976). . . .
>
> [A] requirement that the affidavit demonstrate that the target cell phone itself is used in connection with criminal activity effectively requires that the phone must be an instrumentality of criminal activity. This position is directly contradicted by the Supreme Court's decision in *Warden*, which states that "[n]othing in the language of the Fourth Amendment supports the distinction between 'mere evidence' and instrumentalities." 387 U.S. at 301.

*Id.* Because the Fourth Amendment does not limit the Government to seizing only instrumentalities of crime, a cell phone's nexus to criminal activity need not arise solely as an instrument that facilitates the charged crime. And as set forth above, the Third Circuit appears to

- 10 -

have adopted a similar view when it held that an affidavit may establish "a fair probability that . . . evidence of a crime will be found in a particular place" through not only "direct evidence linking the crime with the place to be searched," but also inferences based on "the type of crime, the nature of the items sought, the suspect's opportunity for concealment and . . . where a criminal might hide [evidence]." *Stearn*, 597 F.3d at 554 (first quoting *Gates*, 462 U.S. at 238, and then quoting *Jones*, 994 F.2d at 1056). In the traditional context, *Stearn* permits searching not only those buildings where defendants conduct their criminal activity, but also more tangential buildings where, for example, defendants conduct no such activity but conceal evidence of their crimes. Law enforcement may likewise search a phone, then, not only if it is a vehicle for criminal activity, but also if there exists a fair probability that it contains evidence of a crime—such as location data placing an individual at a business offering services that the individual cannot lawfully enjoy.

Here, the Government's affidavit established that Mr. Rashwan had previously rented firearms at the Heritage Guild range on multiple occasions, had attempted to purchase his own firearm by completing ATF Form 4473, and had apparently made multiple misrepresentations in that document about information that would have disqualified him from purchasing his own firearm. Search Warrant Aff. ¶¶ 16–19. Based on this "escalat[ing]" prior conduct, the Government affiant expected that evidence of criminal activity would follow from the issuance of the requested search warrant, including "the identification of locations where Rashwan illegally possesses and discharges firearms at shooting ranges[] and further attempts by Rashwan to illegally purchase firearms . . . ." *Id.* ¶ 20. These sworn statements sufficed to provide Judge Carlos with a substantial basis to believe that the requisite probable cause existed.

Even if the Court were to adopt the more stringent standard set forth in *Powell*, 943 F. Supp. 2d at 779, the Government's affidavit arguably would pass muster. There, the court held

that "the government should show that a criminal suspect under investigation is the likely user of the cell phone at issue and that he or she uses the cell phone in connection with criminal activity," because "tracking a phone used in furtherance of criminal activity is likely to lead to evidence of criminal activity, whereas tracking phones, the use of which is unconnected to criminal activity, will likely demonstrate where a person conducts highly personal business." *Id.* The Government's affidavit in this case noted that on at least one of the many occasions on which Mr. Rashwan rented firearms from the Heritage Guild range, he used his cell phone in the course of filling out the requisite form. Search Warrant Aff. ¶ 1 n.1. In a literal sense, at least, this constitutes using the relevant cell phone in connection with criminal activity. But even if that usage amounts to a "doubtful or marginal case[]," such cases "should be largely determined by the preference to be accorded to warrants." *Gates*, 462 U.S. at 237 n.10.[5] Accordingly, the Court declines to overturn Judge Carlos's determination that the ping warrant was supported by probable cause, and Mr. Rashwan's request to suppress evidence on this basis is denied.

---

[5] Also because Mr. Rashwan has, at best, established a "doubtful or marginal case[]," *Gates*, 462 U.S. at 237 n.10, the Court alternatively finds that law enforcement relied on the search warrant in good faith, *see United States v. Ross*, 456 U.S. 798, 823 n.32 (1982) ("Although an officer may establish that he acted in good faith in conducting the search by other evidence, a warrant issued by a magistrate normally suffices to establish it."), and, therefore, excluding the relevant evidence would be inappropriate, *see United States v. Leon*, 468 U.S. 897, 922 (1984) ("[T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion."). The Fourth Amendment's application to cell phone location data is a nuanced, developing area of law, and even if this Court invalidated Judge Carlos's order, law enforcement had no basis to believe, when executing the search warrant, that such order was inconsistent with the law. Further, the rare circumstances that justify exclusion—namely, cases in which "the magistrate . . . was misled by information in an affidavit that the affiant knew was false[,] . . . the issuing magistrate wholly abandoned his judicial role," the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or the warrant was "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid," *id.* at 923 (citations omitted)—are not present here.

### B. The Questioning and Arrest of Mr. Rashwan at the Shooting Range

Mr. Rashwan next invokes the protections of the Fourth Amendment to challenge his questioning and, eventually, arrest at the state game lands range on March 12, 2022. To resolve this issue, the Court must determine whether and when a search or seizure occurred during the interaction between Mr. Rashwan, his brothers, Officer Furmato, and TFO Kreider. (The parties agree that, at minimum, a seizure occurred when the special agents arrived and arrested Mr. Rashwan.) For the following reasons, the Court finds that no seizure occurred prior to Mr. Rashwan's indication that he and his brothers were preparing to leave the range. By that time, however, TFO Kreider possessed not just the requisite reasonable, articulable suspicion to justify an investigatory stop, but also sufficient probable cause to support an arrest. Accordingly, the Court finds that law enforcement satisfied the requirements of the Fourth Amendment during the events of March 12, 2022.

Not all interactions with law enforcement amount to a seizure under the Fourth Amendment. "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and . . . will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Fla. v. Bostick*, 501 U.S. 429, 434 (1991) (citation omitted) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). In determining whether law enforcement's conduct would lead a reasonable person to feel this way, the Court must "tak[e] into account all of the circumstances surrounding the encounter." *Id.* at 437; *see also Terry*, 392 U.S. at 19 n.16 ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). The U.S. Supreme Court has elaborated that "no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage— so long as the officers do not convey a message that compliance with their requests is required."

*Id.* In contrast, "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (gathering cases).

Even when a consensual encounter evolves into a Fourth Amendment seizure, there are several exceptions to the general rule that probable cause must support that seizure. One such exception is that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Wardlow*, 528 U.S. at 123 (citing *Terry*, 392 U.S. at 30). But although "reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," law enforcement must have "at least a minimal level of objective justification for making the stop," as opposed to "an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 123–24 (cleaned up) (first citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989), and then citing *Terry*, 392 U.S. at 27). In articulating a reasonable suspicion, "[t]he collective knowledge doctrine allows imputation of one law enforcement officer's knowledge to another officer who actually makes a stop, even if the latter does not possess all relevant facts." *United States v. Gonzalez*, 630 F. App'x 157, 161 (3d Cir. 2015) (gathering cases). Under that doctrine, the Court assesses "whether the officers who issued the statements possessed the requisite basis to seize the suspect." *Id.* at 162 (quoting *Rogers v. Powell*, 120 F.3d 446, 453 (3d Cir. 1997)).

The scope of an investigatory stop is not unbounded, however, and "must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *Fla. v. Royer*,

460 U.S. 491, 500 (1983) (cleaned up) (quoting *Terry*, 392 U.S. at 19). In other words, the duration "must be temporary and last no longer than is necessary to effectuate the purpose of the stop," and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* But the U.S. Supreme Court's "cases impose no rigid time limitation on *Terry* stops," and even lengthy stops may be justified so long as law enforcement did not "*unnecessarily* prolong[]" the interaction. *United States v. Sharpe*, 470 U.S. 675, 685 (1985). Absent any bright-line rules, this Court must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.* (gathering cases).

When law enforcement effectuates an arrest—including when an investigatory stop has evolved into a *de facto* arrest—the arrest must be supported by probable cause, which "exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002). The Third Circuit has "stated that this standard 'requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt.'" *United States v. Burton*, 288 F.3d 91, 98 (3d Cir. 2002) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482–83 (3d Cir. 1995)).

With these doctrines in mind, the Court finds that at least until 1:32 p.m., when Mr. Rashwan indicated that he and his brothers were preparing to leave the range, a reasonable person in Mr. Rashwan's place would have felt at liberty to ignore the presence of Officer Furmato and TFO Kreider and go about his business. Officer Furmato, in approaching the group, was performing a routine range check and engaged in casual conversation. As one example of the

atmosphere of the interaction, Officer Furmato permitted the group, on multiple occasions, to continue shooting the firearm while he reviewed their documents. Later, after TFO Kreider arrived, Mr. Rashwan was free to leave to use the restroom without being accompanied by the officers. The officers likewise had examined the group's identification and range permit without conveying that compliance was required. Completely absent from this interaction were the hallmarks of a non-consensual encounter: the lone presence of Officer Furmato, later joined by only one additional officer, did not amount to the "threatening presence of several officers"; neither officer displayed their weapon at any point (and, in fact, it was Mr. Rashwan who was permitted to continue using his weapon); there was no "physical touching of the person of the citizen" until *after* Mr. Rashwan sought to leave; and the officers' demeanor and tone of voice never indicated that compliance was required. Accordingly, no Fourth Amendment "seizure" occurred before Mr. Rashwan suggested that the group was preparing to exit the range.[6]

When Mr. Rashwan's statement prompted TFO Kreider to say that he would first make a call to "see what's taking so long," reasonable persons may have interpreted this as suggesting that they were *not* free to leave. This suggestion became even more apparent when TFO Kreider returned and secured the firearm and ammunition a few minutes later. But if the interaction then became an investigatory stop, TFO Kreider possessed the requisite reasonable, articulable suspicion. Even further, this Court finds that TFO Kreider possessed probable cause to effectuate an arrest at that point. TFO Kreider knew that due to Mr. Rashwan's alleged immigration status, federal law prohibited his possession of firearms. TFO Kreider was likewise familiar with the

---

[6] Even if the arrival of TFO Kreider elevated the consensual encounter into an investigatory stop, for the reasons provided in the following paragraph, TFO Kreider possessed the requisite reasonable, articulable suspicion that Mr. Rashwan violated federal law concerning the possession of firearms by certain prohibited persons.

investigation into Mr. Rashwan's rental of firearms at the Heritage Guild.  Even before speaking with Mr. Rashwan, TFO Kreider had been informed by Special Agent Garcia that location data placed Mr. Rashwan at the state game lands shooting range, obviously a place where Mr. Rashwan would be likely to use firearms.  TFO Kreider further knew that Officer Furmato witnessed Mr. Rashwan using the firearm at the range.  Accordingly, by the time that Mr. Rashwan indicated his desire to leave, TFO Kreider had not just reasonable suspicion but also probable cause to believe that Mr. Rashwan unlawfully possessed a firearm as a prohibited person.  This same knowledge supplies the requisite probable cause for the special agents' eventual arrest of Mr. Rashwan.  For the foregoing reasons, law enforcement satisfied the requirements of the Fourth Amendment throughout the course of the interaction with Mr. Rashwan and his brothers.

      C.      **The Timing of Law Enforcement's Provision of *Miranda* Warnings**

Mr. Rashwan's final line of argument concerns law enforcement's provision of *Miranda* warnings (or the lack thereof).  In that case, the U.S. Supreme Court considered the Fifth Amendment's protection against self-incriminating statements and held as follows:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  The Third Circuit has explained that "[a] person is in custody when he either is arrested formally or his freedom of movement is restricted to 'the degree associated with a formal arrest.'"  *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (quoting *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999)).  Factors for this Court to assess include the following:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*Id.* at 359–60.

Above, this Court considered analogous factors and concluded that the soonest point at which a reasonable person would *not* have felt free to leave the encounter with Officer Furmato and TFO Kreider was when Mr. Rashwan indicated his desire to leave and TFO Kreider implicitly rejected that request by leaving to make a call and, a few minutes later, returning to secure the firearm and ammunition. For the same reasons, that moment is the first point at which Mr. Rashwan was in custody and *Miranda* might apply.[7]

After TFO Kreider confiscated the firearm and ammunition, the officers patted down Mr. Rashwan and his brothers. Before eventually permitting the group to wait in the officers' vehicles, TFO Kreider led Mr. Rashwan away from his brothers and asked him about his acquisition of the firearm through an online forum. Under the *Willaman* factors, Mr. Rashwan still was not in custody at this point: Although TFO Kreider did not tell him he was free to leave, TFO Kreider also did not suggest that Mr. Rashwan was under arrest or instruct him that he must answer TFO Kreider's questions; Mr. Rashwan remained outside at a public range; this line of questioning lasted only a few minutes; other than an initial pat-down, TFO Kreider did not use coercive tactics,

---

[7] As the Government correctly notes, whether Officer Furmato or TFO Kreider intended to arrest Mr. Rashwan or elicit incriminating information does not suffice to establish a custodial interrogation. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."); *United States v. Kim*, 27 F.3d 947, 953 (3d Cir. 1994) ("[P]otentially incriminating questions do not by themselves make an encounter coercive.").

draw his weapon, or restrain Mr. Rashwan's movement; and Mr. Rashwan voluntarily answered questions (and even asked some of his own).  Although Mr. Rashwan's subsequent placement in a police vehicle arguably tips the second factor in favor of finding that he was in custody, the parties have not identified any relevant statements made between the point at which Mr. Rashwan was placed in the vehicle and when he was Mirandized at the FBI office in Allentown.  In short, and based on the above, the Court finds that the incriminating statements offered by Mr. Rashwan on March 12, 2022, were either made while he was not in custody or after he had been Mirandized.

### III.   CONCLUSION

For the foregoing reasons, the Court denies Mr. Rashwan's Motion.  A corresponding order accompanies this memorandum.